# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville April 23, 2014

## STATE OF TENNESSEE v. JACOB AARON ERVIN

**Appeal from the Circuit Court for Marshall County**
**No. 2013-CR-53    Lee Russell, Judge**

_____

**No. M2013-01921-CCA-R3-CD - Filed June 27, 2014**

_____

The defendant, Jacob Aaron Ervin, was convicted by a Marshall County jury of simple assault, a Class A misdemeanor, and was sentenced by the trial court to eleven months, twenty-nine days in jail at 75%. On appeal, he challenges the sufficiency of the evidence and argues that the trial court imposed an excessive sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Donna O. Hargrove, District Public Defender; and William J. Harold, Assistant Public Defender, for the appellant, Jacob Aaron Ervin.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Robert James Carter, District Attorney General; and Weakley E. Barnard and William B. Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

According to the State's proof at trial, the defendant spent the afternoon and evening of March 17, 2013, drinking alcohol and playing a card game with his friend, John Wesley Richards, Richards' fiancée, Lauren Dumsoer, and Dumsoer's friend, Kristy Tadajewski, in Richards' Lewisburg home. Late in the evening, the defendant lost his temper, threw his cards down on the floor, slapped Richards in the face, and retreated to the upper floor of the home, where he had been living temporarily following his recent move back to Tennessee.

When Richards later started upstairs to talk with him, the defendant aimed the laser sight of a handgun at Richards' face and threatened to kill him if he came upstairs. Richards and the two women responded by fleeing the home and calling 911. The defendant was subsequently indicted by the Marshall County Grand Jury with the aggravated assault of Richards and the reckless endangerment of Richards, Tadajewski, and Dumsoer. The jury convicted him of the lesser-included offense of simple assault of Richards and acquitted him of the three reckless endangerment counts of the indictment.

At the defendant's trial, Richards testified that the defendant was a childhood friend who had recently moved back to Tennessee from Arizona. He said he had invited the defendant to stay with him and his fiancée, Lauren Dumsoer, in his Lewisburg home and that the defendant had been living on the second floor of the home for approximately three weeks when the incident occurred. On that day, he, Dumsoer, and the defendant returned home at about 1:30 or 2:00 p.m. after going to church and then dining out with Dumsoer's family. A couple of hours later, Dumsoer's friend, Kristy Tadajewski, came over and the four of them began playing spades. Richards testified that he had one mixed alcoholic drink and that the women each had one or two beers but that the defendant drank heavily throughout the afternoon and evening and was intoxicated when the incident occurred. He said he and the defendant were partnered and were winning the card game when the defendant, for no obvious reason, became upset and slammed his cards down on the table, causing them to fall behind Richards. The defendant demanded that he pick up the cards, at the same time calling him names. He refused and the defendant stood up, began picking up the cards, and then suddenly slapped him hard on the face, called him more names, and "stormed off" to his upstairs living quarters.

Richards testified that he and the women went upstairs to talk to the defendant, who remained upset and kept threatening to leave. After about twenty minutes, he and Tadajewski left while Dumsoer stayed behind to talk to the defendant alone. When she came back downstairs, he decided to go back upstairs to try to talk to the defendant again. However, as soon as he opened the door to the stairway, a red laser sight from the defendant's handgun was pointed on his face, and the defendant said, "You come up here, you will die." Richards testified that he responded by quickly closing the door and telling the women that the defendant had a gun and the three of them needed to leave the house. He said he was aware that the defendant possessed guns but had not been aware, before that time, that the defendant had them in the house, as he had instructed him not to bring them into his home. He stated that Tadajewski dialed 911 on her cell phone and handed the phone to him as they exited the home. He said he was on the porch talking with the 911 operator when he saw the defendant come downstairs with a gun in his hand. He told the women what he had seen and instructed them to run, and all three of them fled from the home.

At the request of the State, Richards read aloud a letter of apology he had received from the defendant following the incident. In the letter, the defendant asked for forgiveness from Richards and Dumsoer, said that a lot of things had happened to him in the past and that he had wrongly taken them out on Richards that night, claimed that he was just shining the laser down the hall to prevent Richards from coming upstairs because he was afraid Richards would beat him up, and requested that Richards drop the charges against him. On cross- and recross-examination, Richards denied that he fought with the defendant or threw him down that night. He insisted that when he opened the door to the stairway, he saw the defendant holding a handgun with the red dot from the laser sight trained on his face, although he conceded he did not mention seeing the gun in his statement to police. Finally, he acknowledged he had been convicted of the sale of a Schedule II controlled substance and of the sale of morphine in a Drug-Free School Zone.

Lauren Dumsoer, Richards' fiancée, testified that Tadajewski, who had never met the defendant before, arrived at the house at about 6:00 or 6:30 p.m. on March 17, 2013. She said all four of them were drinking that night but that she, Richards, and Tadajewski each had only one to two mixed drinks and began limiting their alcohol intake as the evening wore on. The defendant, however, continued to drink and became obviously intoxicated by the end of their first card game. Dumsoer said that there had been no disagreement or unpleasantness among the group at the time that she excused herself to the restroom at the end of the evening. When she came out, Tadajewski informed her that the men were arguing upstairs and that they needed to stop them. She and Tadajewski then went upstairs, where she found the men arguing and shoving each other. She and Tadajewski separated them, and Tadajewski talked Richards into going back downstairs with her while she remained upstairs to talk with the defendant. During their conversation, the defendant revealed that he was upset because he had been sexually molested in the past by someone "very close to him." On cross-examination, Dumsoer testified that the person the defendant named as his molester was Richards' father.

Dumsoer testified that she was distraught by the defendant's revelation and went downstairs to divulge what she had learned to Richards and Tadajewski. She and Richards discussed their course of action and ultimately decided that they would ask the defendant to leave their home the next morning. She described Richards as "heartbroken," rather than angry, and said that he decided to go back upstairs to talk to the defendant about his allegations. She testified that Richards walked to the stairway door, pulled it open, and then "very calmly shut the door," turned to her and Tadajewski, and said, "Girls, he's got a gun. You need to get out of the house." She stated that as they were moving toward the front door, Tadajewski dialed 911 on her cell phone and handed the phone to Richards. All three of them were on the front porch by the time Richards was talking with the 911 dispatcher. At that point, Richards told her and Tadajewski that the defendant was coming down the

stairs, and the three of them "scattered and ran." On cross-examination, she testified that she never saw the defendant with a gun that night.

Kristy Tadajewski testified that there had been no conflict between the two men during the card game but that the defendant, who had been drinking all night, suddenly threw his cards at Richards. She said that Richards asked the defendant to pick up the cards and that the defendant told Richards to do it. Finally, the defendant got up, picked up the cards, leaned across the table, and delivered a forceful slap to Richards' face. Richards and the defendant began arguing, and Richards told the defendant to go upstairs, which he did. Dumsoer came out of the restroom, and all three of them went upstairs to talk to the defendant. They were unsuccessful in their attempts to calm the defendant down, so she and Richards went back downstairs, leaving Dumsoer alone upstairs with the defendant. Ten or twelve minutes later, Dumsoer came back downstairs and divulged to Richards what the defendant had just told her. After waiting about five minutes, Richards walked over and opened the door to the stairs but then quickly closed it, saying that the defendant had a gun. Tadajewski testified that, during the time that Richards had the door open, she overheard the defendant say that if Richards came up the stairs, he would die. She said she got up, dialed 911, and handed the phone to Richards as she, Dumsoer, and Richards exited the house. She stated that the three of them stood together on the front porch for a second until Richards said that he saw the defendant coming out, at which point the three of them fled.

Sergeant Kevin Patin of the Lewisburg Police Department testified that he responded to the scene at approximately 11:45 p.m., approached the house with gun drawn, and through the closed front door ordered the defendant, whom he could see walking around inside, to show him his hands and come toward him. The defendant complied by raising his hands and approaching the front door. Sergeant Patin said he lost sight of the defendant briefly as he was opening the front door. When he was able to see him again, he observed the defendant dropping his right hand to his back and then throwing a handgun onto the couch. At that point, he grabbed the defendant and took him to the ground, where his fellow officers assisted in handcuffing him. Afterwards, Officer Davis patted down the defendant and found a second handgun in the defendant's front waistband. Sergeant Patin testified that the weapon the defendant threw onto the couch was a .40 caliber Smith and Wesson with an attached laser dot scope. The weapon had a fully loaded magazine but no round chambered into the barrel. The weapon found in the defendant's front waistband was a .357 Glock that was loaded and with one round chambered into the barrel, making it, according to Sergeant Patin's terminology, "cocked and locked and ready to rock." On cross-examination, he testified that the Smith and Wesson handgun had a "grip-mounted" laser sight that, to the best of his knowledge, could not be removed from the weapon.

-4-

Officer John Michael Davis of the Lewisburg Police Department identified the .357 caliber Glock 32 handgun that he recovered from the defendant's front waistband. On cross-examination, he acknowledged that the defendant informed him that he had the gun in his waistband as he was performing his pat down.

Officer Clint Newbill of the Lewisburg Police Department identified the .40 caliber Smith and Wesson handgun that he had recovered from the couch.

The defendant testified that after lunch he played upstairs with Richards' cats by using the laser sight from his handgun, which he had removed from the weapon. According to the defendant, the laser sight was easily detachable. Later that afternoon, Tadajewski arrived and the four of them began playing cards. The defendant said that he had a total of three beers and about half of one mixed drink at the time the incident occurred. He stated that he was not angry when he threw his cards down on the table at the end of a hand. He said a few of the cards dropped on the floor on Richards' side of the table, which seemed to make Richards, who was drunk, angry. Richards told him that he needed to come pick up the cards, and he responded that they were closer to Richards and asked what was the big deal. When Richards insisted, he told Richards he did not care and would leave the cards on the floor. He then started upstairs to retrieve his cell phone charger. As he was walking past Richards, he saw Richards bent over picking up the cards, which amused him. He, therefore, playfully tapped Richards on the face and jokingly called him "a little name," before continuing on his way upstairs.

The defendant testified that he heard Richards threatening to "kick [his] butt" as he was walking up the stairs. He said he did not believe that Richards was serious, but as soon as he turned the corner at the top of the stairs, Richards hit him from behind, sending him flying into a recliner. As he was getting up, Richards knocked him down again and began hitting him with his fists. After Richards had knocked him down a third time, the women came upstairs and separated them. The defendant testified that he was very upset and at that moment divulged to Richards that Richards' father had sexually molested him. He said he wanted to leave Richards' home right then, but Richards was blocking his exit. Tadajewski finally talked Richards into going downstairs, and Dumsoer stayed upstairs to talk to him for about five minutes before she, too, went downstairs. Next, he heard Richards from downstairs say to the women that he was going back upstairs. Afraid that Richards would assault him again, he picked up his laser sight, which was still detached from the gun, yelled to Richards not to come up and that he would kill him if he did, and then shined the laser sight in Richards' eye when he opened the door to the stairway.

The defendant testified that he remained upstairs until he heard sounds that made him believe that Richards and the women had left the house. Seizing the opportunity to exit

himself, he grabbed his two weapons, put the laser sight back onto his Smith and Wesson, removed all the ammunition from the Glock, placed both guns in his front waistband, went downstairs, and headed for the front door. When he saw the police officer, he threw his Glock onto the couch because it was an unregistered weapon and he thought he would get into trouble for having it. After the officers had handcuffed him and were about to put him in the patrol car, he informed them that he had the Smith and Wesson in his front waistband.

On cross-examination, the defendant claimed that every one of the State's witnesses, including the police officers, were lying in their testimony.

Following deliberations, the jury convicted the defendant of the lesser-included offense of the misdemeanor assault of Richards, finding that the State had failed to prove beyond a reasonable doubt that the assault was accomplished with a deadly weapon. The jury acquitted the defendant of the reckless endangerment counts of the indictment. At the conclusion of a sentencing hearing, the trial court found one applicable enhancement factor – the defendant's previous history of criminal convictions – and no applicable mitigating factors and sentenced the defendant to the maximum term of eleven months, twenty-nine days at 75%.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to sustain his conviction for simple assault, arguing that there was no evidence that he caused any injury to Richards, intended Richards to fear imminent bodily injury, or that a reasonable person in Richards' situation would have found the playful tap he delivered to his face offensive. The State disagrees, arguing that there is ample evidence that the defendant both intentionally and knowingly caused Richards to fear imminent bodily injury. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of

fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A person commits misdemeanor assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101(a) (2010).

In this case, the defendant was charged with knowingly or intentionally committing an assault against Richards by causing Richards to reasonably fear imminent bodily injury. "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(18). "'Knowing' means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that

the conduct is reasonably certain to cause the result[.]"  Id. § 39-11-106(20).

Viewed in the light most favorable to the State, the evidence is more than sufficient to show that the defendant both intentionally and knowingly caused Richards to reasonably fear imminent bodily injury by aiming the laser sight of his handgun at Richards' face and threatening to kill him.  We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for misdemeanor assault.

## II. Sentencing

The defendant contends that his eleven-month-twenty-nine-day sentence for his misdemeanor assault conviction is excessive and contrary to law, arguing that the trial court's imposition of the maximum sentence after finding only one enhancement factor was "clearly excessive based on the facts at hand."  We respectfully disagree.

Appellate review of misdemeanor sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct.  Tenn. Code Ann. §§ 40-35-401(d), -402(d).  This presumption of correctness is conditioned upon the affirmative showing that the trial court considered the relevant facts, circumstances, and sentencing principles.  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  The burden is on the appealing party to show that the sentence is improper.  See Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Cmts.

The trial court is afforded considerable latitude in misdemeanor sentencing.  See, e.g., State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999).  When imposing a misdemeanor sentence, the trial court is not required to conduct a sentencing hearing, but it must afford the parties a reasonable opportunity to address the length and manner of service of the sentence.  Tenn. Code Ann. § 40-35-302(a).  Moreover, the trial court is not required to place specific findings on the record, State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998), but must consider the principles of sentencing and the appropriate enhancement and mitigating factors in determining the percentage of the sentence to be served in actual confinement.  Tenn. Code Ann. § 40-35-302(d).

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

(A)  Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B)  Confinement is necessary to avoid depreciating the seriousness of the

offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C)   Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1).

The defendant has failed to show that the sentence imposed by the trial court is improper.  The trial court reached its sentencing conclusion based on the defendant's prior history of two misdemeanor convictions, which the court found serious, and the facts and circumstances surrounding the instant offense, including the fact that the defendant was in possession of two loaded guns at the time of his arrest.  Based on our review, we cannot conclude that the trial court erred in sentencing the defendant to the maximum term for his misdemeanor conviction.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE